## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| TORVENT LLC, | § | |
| | § | |
| Plaintiff, | § | |
| | § | Civil Action No._____ |
| v. | § | |
| | § | |
| TECHTRONIC INDUSTRIES CO., LTD.; | § | |
| TECHTRONIC INDUSTRIES NORTH | § | |
| AMERICA, INC.; ONE WORLD | § | **JURY TRIAL DEMANDED** |
| TECHNOLOGIES, INC.; HOMELITE | § | |
| CONSUMER PRODUCTS, INC.; HART | § | |
| CONSUMER  PRODUCTS, INC.; THE | § | |
| HOME DEPOT, INC.; AND WALMART | § | |
| INC., | § | |
| | § | |
| Defendants. | § | |
| | § | |

## COMPLAINT FOR WILLFUL PATENT INFRINGEMENT

Plaintiff Torvent LLC ("Torvent") files this Complaint for patent infringement and

willful patent infringement against Defendants Techtronic Industries Co., Ltd.; Techtronic

Industries North America, Inc.; One World Technologies, Inc.; Homelite Consumer Products,

Inc.; Hart Consumer Products, Inc. (collectively, "TTi"); The Home Depot, Inc.; and Walmart

Inc. (collectively, the "Defendants"), and alleges as follows:

### I.     INTRODUCTION

1.     This case is about more than simply patents for trimmer heads used on line trimmers,

or, more colloquially, weed-whackers or weed-eaters.  This case is a classic David versus

Goliath story.  It is about how TTi, a multi-billion-dollar international corporation, and its head

of product development, Eric Nolin, took advantage of and deliberately betrayed a nearly

decade-old business relationship with George E. Alliss, a prolific inventor in the field of easy-to-

load trimmer heads for use on line trimmers, by deliberately misappropriating Alliss' new and

patented trimmer head designs.  TTi apparently thought that Torvent could not afford to file a lawsuit.

2.    The story begins with an email from Nolin that, in essence, said: "George, do you have any new trimmer head designs?"  Alliss responded immediately that he did.  A short time later, under an agreement of confidentiality ("NDA") and with the clear understanding that Torvian, Inc. ("Torvian"), the predecessor to Torvent, would be compensated, Torvian sent all of its native CAD files for its new trimmer head to Nolin, VP of Product Development at TTiNA (defined below), located in Anderson, South Carolina.  While pretending to negotiate in good faith over the terms of an agreement, TTi and Nolin apparently were making plans to manufacture the new trimmer head independently in blatant disregard of the NDA as well as Alliss' and Torvian's existing and pending patents.  Finally, after taking from Torvian all that TTi needed in weekly and sometimes daily communications over a six-month period, on September 17, 2015, Nolin finally informed Torvian by phone and by email:

> ***If you will remember***, ***you provided CAD files for your CobraMax head for the purpose of developing a head for TTi***… .  As we prototyped and evaluated the design, we found several areas that needed improvement / design changes, including smaller size, lower cost eyelets, spool changes to reduce incidents of tangling and other changes to geometry that allowed for better overall loading, all of which is reflected in this file.  Again, ***it is our position that there is no intellectual property in this design*** for which royalties would be owed.  However, ***since the 'foundation' of this design came from your design, we would be willing to work out a one-time payment to compensate you for your work.  We would be very interested in selling our version to you*** at a cost that leverages our economies of scale, as we have previously discussed.

*See* Ex. 29 (emphasis added).  To say the least, this email was insulting on numerous levels.

3.    Alliss of course "remembered" sending Torvian's proprietary CAD files.  The very small changes referenced by Nolin were immaterial to the inventions embodied in Torvian's new trimmer head design and were but a pretext for doing what any objective person would know

was ethically wrong.  The statement that there was "no [IP] in this design" was incorrect.  IP already existed.  TTi's knock-off trimmer head infringes the '249 Patent (defined below), which issued in 2011.  TTi should have known of the pending U.S. Application No. 14/548,392, which published as US20150150191A1 on June 4, 2015, and issued as the '807 Patent (defined below).  TTi was provided a copy of the '191 Publication in December 2015.  Nevertheless, TTi moved forward with its knock-off trimmer head, which it first labeled as the "Reel Easy Speed Winder" under the RYOBI trademark, and first introduced and sold this knock-off at Home Depot in March 2017.  Later, it introduced the knock-off trimmer head under other brand names in or about March 2020 at WalMart.  TTi's offer of "selling our version to you" was especially audacious.  TTi's acts constitute an egregious example of willful patent infringement.  Now, Torvent, the successor to Torvian, seeks justice by doing what TTi evidently assumed Torvent would not do, filing this lawsuit.

## II.    **PARTIES**

4.    Torvent is a Delaware limited liability company.  *See* Ex. 7, a true and correct copy of the Certificate of Good Standing for Torvent.

5.    Techtronic Industries Co., Ltd. ("TTi-HK") is based in Hong Kong, China, with a principal place of business at 29/F, Tower 2, Kowloon Commerce Centre, 51 Kwai Cheong Road, Kwai Chung, New Territories, Hong Kong, China.  Ex. 8, a true and correct copy of TTi's Annual Report for 2020, at 165 (the "TTi 2020 Annual Report").  TTi-HK was formed in 1985 and publicly listed on the Stock Exchange of Hong Kong, China in 1990.  *Id*., Table of Contents, "Company Profile."  TTi claims to be "a fast-growing world leader in outdoor power equipment."  *Id*.  It also claims that "[t]he principal activities of [TTi-HK] and its subsidiaries … are the manufacturing and trading of electronics and electronic products."  *Id*. at 165.  TTi-HK purports to have had "record 2020 worldwide sales of US \$9.8 billion and over 48,000

employees." *Id.*  TTi-HK has 11,884 employees in the "Americas," some of which are present in the United States.  *Id.* at 138; 144.  On information and belief, TTi-HK makes approximately seventy-five percent (75%) of its worldwide sales in North America.  *Id.* at 191.

6.   Techtronic Industries North America, Inc. ("TTiNA") is a Delaware corporation with its principal place of business at 303 International Circle, Suite 4900, Hunt Valley, Maryland 21030.  On information and belief, TTiNA is a wholly-owned subsidiary of TTi-HK.  TTiNA's registered agent for service is Corporation Service Company, 251 Little Falls Drive, Wilmington, Delaware 19808.

7.   One World Technologies, Inc. ("OWT") is a Delaware corporation.  On information and belief, OWT has a principal place of business at 1428 Pearman Dairy Road, Anderson, South Carolina 29625 and/or a principal place of business at 100 Innovation Way, Anderson, South Carolina 29621.  *See* https://www.ryobitools.com/support/contact (last accessed 5-19-2021).  On information and belief, OWT also does business as Techtronic Industries Power Equipment.  On information and belief, OWT has a license to the trademark "RYOBI" granted by Ryobi Limited.  *See* https://www.ryobitools.com/outdoor (last accessed 5-19-2021) ("'RYOBI' is a trademark of RYOBI Limited and is used by One World pursuant to a license granted by RYOBI Limited.").  OWT sells RYOBI branded products only at Home Depot.  *Id.* ("Only at The Home Depot").  OWT has a registered agent for service, Corporation Service Company, at 251 Little Falls Drive, Wilmington, Delaware 19808.

8.   Homelite Consumer Products, Inc. ("Homelite") is a Delaware corporation.  On information and belief, Homelite has a principal place of business at 1428 Pearman Dairy Rd., Anderson, South Carolina.  https://www.homelite.com/service_support (last accessed 5-19-

2021).  Homelite has a registered agent for service, Corporation Service Company, at 251 Little Falls Drive, Wilmington, Delaware 19808.

9.    Hart Consumer Products, Inc. ("Hart") is a Delaware corporation formed in February 2019, and has a principal place of business in Anderson, South Carolina.  On information and belief, the HART trademarks are held by Techtronic Cordless GP.  *See* Ex. 9, a true and correct copy of the webpage at  https://www.harttools.com/products/power-tools/ ("… HART … are the trademarks of Techtronic Cordless GP").  Hart has a registered agent for service, Corporation Service Company, at 251 Little Falls Dr., Wilmington, DE 19808.  On information and belief, Blackmax Tools Ltd. ("Blackmax") is a d/b/a of Hart.  The website for Blackmax shows a principal place of business in Anderson, South Carolina.

https://www.blackmaxtools.com/services/contacts (last accessed 5-19-2021).  (TTi-HK, TTiNA, OWT, Homelite, Hart, and Blackmax are collectively referred to herein as "TTi"; TTiNA, OWT, Homelite, Hart, and Blackmax are collectively referred to herein as "TTi US").

10.   The Home Depot, Inc. ("Home Depot") is a Delaware corporation with a principal place of business at 2455 Paces Ferry Road, Atlanta, Georgia 30339.  Home Depot's registered agent for service is Corporation Service Company, 251 Little Falls Dr., Wilmington, Delaware 19808.

11.   Home Depot operates stores within this District at least at the following locations: (1) 801 N. Dupont Hwy, Dover, Delaware 19901; (2) 17832 Coastal Hwy, Lewes, Delaware 19958; (3) 350 Auto Park Dr., Middleton, Delaware, 19709; (4) 2000 Peoples Plaza, Newark, Delaware 19702; (5) 138 Sunset Blvd., New Castle, Delaware 19720; (6) 1301 New Churchmans Rd., Newark, Delaware 19713; (7) 1000 Suburban Dr., Newark, Delaware 19711; (8) 3600 Miller Road, Wilmington, Delaware 19802; and (9) 601 Naamans Rd., Claymont, Delaware

19703.  Home Depot offers for sale and sells some or all of the Accused Products (defined below) in one or more of the stores located in this District.

12.  Walmart Inc. ("Walmart") is a Delaware corporation with a principal place of business at 702 S.W. 8th Street, Bentonville, AR 72716.  Walmart's registered agent for service is The Corporation Trust Company, Corporation Trust Center, 1209 Orange Street, Wilmington, Delaware 19801.

13.  Walmart operates stores within this District at least at the following locations: (1) 263 Walmart Dr., Camden, Delaware 19934; (2) 705 Middletown Warwick Rd., Middletown, Delaware 19709; (3) 18922 Rehoboth Mall Blvd., Rehoboth Beach, Delaware 19971; (4) 36 Jerome Dr., Dover, Delaware 19901; (5) 939 N. Dupont Blvd., Milford, Delaware 19963; (6) 22899 Sussex Hwy., Seaford, Delaware 19973; (7) 4 College Park Ln., Georgetown, Delaware 19947; (8) 117 Wilton Blvd., New Castle, Delaware 19720; and (9) 1251 Centerville Rd., Wilmington, Delaware 19808.  Walmart offers for sale and sells one or more of the Accused Products (defined below) in one or more of the stores located in this District.

### III.    JURISDICTION AND VENUE

14.  This civil action for patent infringement arises under the Patent Laws of the United States, 35 U.S.C. §§ 1 et seq., including 35 U.S.C. §§ 271, 281, 284, and 289, among others. The Court has subject-matter jurisdiction over the claims raised in this action pursuant to 28 U.S.C. §§ 1331 and 1338(a).

15.  The Court has personal jurisdiction over each of TTi-US, Home Depot, and Walmart because each is incorporated in Delaware, and, therefore, is a resident of Delaware.  In addition or in the alternative, TTi-US, Home Depot, and Walmart have committed acts of infringement in this District and continue to commit such acts in in this District and/or have placed the Accused

Products (defined below) into the stream of commerce knowing that some of such products would be sold in this District.

16.    This Court has specific or, alternatively, general personal jurisdiction over TTi-HK. On information and belief, TTi-HK is not subject to the jurisdiction of any state's court of general jurisdiction.  TTi has claimed, for example, as recently as 2016 that general jurisdiction did not exist in the courts of Illinois.  *See* Ex. 10, a true and correct copy of TTi-HK's Memorandum of Law in Support of Motion to Dismiss (D.I. 55) in *Chamberlain v. TTi et al*. (including the Declaration of Sean Dougherty attached thereto).

17.    Shares of TTi-HK's stock are routinely purchased and sold by investors including investors in the United States through the OTC dealer network under the symbol "TTNDY."  On information and belief, investors in the United States own shares of TTi-HK's stock.

18.    TTi-HK is the sole owner of TTiNA and owns directly or indirectly the other TTi-US entities.  On information and belief, TTi-HK owns, operates, or controls, directly or indirectly, one or more factories in China that manufacture the Accused Products (defined below) knowing and intending that a substantial percentage of such products would be sold in the United States through one or more of the TTi-US entities.  On information and belief, one or more of the TTi-US entities sells the Accused Products made by TTi-HK in China in the United States to retailers including Home Depot and Walmart.

19.    TT-HK owns and operates a tangled web of entities in the United States, which entities include the TTi-US parties named herein, for the purpose of channeling products manufactured by TTi-HK, including the Accused Products (defined below), in China into the US markets.  *See* Ex. 8, Annual Report, at 144.  TTi-HK intentionally established one or more distribution channels into United States, including Delaware, placed the Accused Products into

the stream of commerce, and/or could have reasonably foreseen that the Accused Products would be sold in the United States, including Delaware, including through Home Depot and/or Walmart stores located in this District.

20.  In addition, and/or in the alternative, TTi-HK and the TTi-US entities have acted together as a joint enterprise to distribute the Accused Products in the United States, including Delaware.  *See* Ex. 8, 2020 Annual Report of TTi-HK, at 144.  On information and belief, TTi-HK controls, dictates, or encourages the activities of TTi-US that constitute infringement of one or more claims of the Asserted Patents, which activities are more specifically described herein.

21.  For example, and not as a limitation, TTiNA or OWT each or collectively operate the following websites:  TTiNA is the registrant for the website ryobitools.com.  TTiNa is the registrant for the website harttools.com.  TTiNA is the administrative and technical contact for the website blackmaxtools.com.  OWT is the registrant for blackmaxtools.com.  *See* https://whois.icann.org/en/about-whois.

22.  For example, and not as a limitation, TTi-HK makes or has made the Accused Products (described below) sold under the TORO trademark, and ships these products for sale in the US by TTi-US.  TTiNA purports to have a license with The Toro Company.  *See* Ex. 11, a true and correct copy of the *Operator's Manual, Model Nos. 51958 and 51978,* at 25.  TTiNA publishes the User Manuals and makes the warranties for the Toro-branded line trimmers.  *Id*. at 26.  OWT operating under the name Techtronic Industries Power Equipment is the TTi entity that publishes the parts list for the Toro line trimmers.  *See* Ex. 12, a true and correct copy of the Parts Catalog for Item No. 51978 *et al*., at 6.

23.  As another example, and not as a limitation, TTi-HK makes or has made the Accused Products (described below) sold under the RYOBI trademark, which, on information

and belief, is licensed by OWT, and ships these products for sale in the US by TTi-US.  On information and belief, RYOBI branded line trimmer products are sold only at Home Depot. The User Manuals for Accused Products under the Ryobi brand are published by Techtronic Industries Power Equipment, that is, OWT.  *See, e.g*., Ex. 13, a true and correct copy of the Operator's Manual, RY252CS and RY253SS, at 44 of 44.  The warranties for the RYOBI branded line trimmer products are made by TTiNA.  *See, e.g*., Ex. 14, a true and correct copy of the Warranty for RY252SS.

24.  As another example, and not as a limitation, TTi-HK makes or has made the Infringing Products (described below) sold under the Homelite trademark and ships these products for sale in the United States.  On information and belief, TTi-HK purchased Homelite in 2001.  The product literature for Homelite branded Accused Products are published by Homelite, which also makes the warranties.  *See, e.g*., Ex. 15, a true and correct copy of the Operator's Manual for UT33600 and 33650.

25.  As another example, and not as a limitation, TTi-HK makes or has made the Accused Products (described below) sold under the HART trademark and ships these products for sales in the United States.  The product literature for HART branded line trimmer products is published by Hart. *See, e.g*., Ex. 16, a true and correct copy of the User Manual for Hart HLST02LB and HLSTO3LB.  The warranties for the products are made by Hart.  Ex. 17, a true and correct copy of the Hart Warranty.  The HART trademark belongs to Techtronic Cordless, GP.  *See* Ex. 18, a true and correct copy of the webpage at https://www.harttools.com/products/power-tools/ ("… HART … are the trademarks of Techtronic Cordless GP") (last accessed 5-19-2021).

26. As another example, without limitation, TTi-HK makes or has made the Accused Products (described below) sold under the Blackmax trademark, and ships these products for sales in the United States. For example, the operator's manuals for the Blackmax-branded Accused Products (defined below) were published by Hart. *See, e.g.*, Ex. 19, a true and correct copy of the Operator's Manual for the BlackMax 25 cc 2 Cycle String Trimmers, Model Numbers BM25CSAC/BM25CSACVNM/BM25SSAC/BMC25SSACVNM. However, OWT is the entity that warranties the Blackmax products. *See* Ex. 20, true and correct copy of warranty at www.blackmaxtools.com as referenced in Ex. 10 at 12.

27. As another example, on information and belief, TTi-HK manages license agreements with entities in the United States. For example, TTi-HK's legal department attempted to assign the then and now expired license agreement between Homelite Technologies, Ltd., a Bermuda corporation believed to be owned by TTi-HK, and Torvian Inc., the predecessor in interest to Torvent, dated December 18, 2007, to Techtronic Cordless, GP. *See* Ex. 21, a true and correct copy of a Letter dated October 10, 2019 from Dyann L. Kostello as "Director" of Techtronic Outdoor Products Technology Ltd.," and Chan Chi Hong as "Manager" of Techtronic Cordless GP, to Alex Phinn, "President" of Torvian Inc. According to this letter, Techtronic Cordless GP is "registered in the States [sic, State] of Nevada in the United States and its registered address is at 100 Innovation Way, Anderson, SC 29621, USA." Techtronic Cordless GP "is wholly owned by" TTi-HK. *Id.*

28. Therefore, the acts of one or more of the TTi-US entities that are residents of this District constitute those of TTi-HK. In addition or in the alternative, TTi-HK and TTi-US should be treated as a single enterprise.

29.    In light of the above minimum contacts with the United States, exercising jurisdiction would be consistent with the United States Constitution and laws.  This Court has personal jurisdiction over TTi-HK under Fed. R. Civ. P. 4(k)(2) upon service of the Complaint or, alternatively, 10 Del. C. § 3104, including but not limited to Subsections (1), (3), and (4).

30.    Venue in this District is proper pursuant to 28 U.S.C. § 1400(b) as to each of TTi-US, Home Depot, and Walmart because each resides in Delaware as each is incorporated in Delaware. In addition or in the alternative, venue is proper as to Home Depot and Walmart pursuant to 28 U.S.C. § 1400(b) because each has committed acts of infringement and has an established place of business in this District.

31.    Venue in this District is proper as to TTi-HK pursuant to 28 U.S.C. §§ 1400(b) and 1391(b)(3) because it is a foreign corporation not resident in the United States.

## IV.    FACTUAL ALLEGATIONS

### The Asserted Patents

32.    Torvent is the owner by assignment of the following United States patents: (1) No. 8,025,249 (the "'249 Patent"); (2) No. 9,516,807 (the "'807 Patent"); (3) No. 9,924,631 (the "'631 Patent"); (4) No. D814,893 (the "'D893 Patent"); (5) No. D598,255 (the "'D255 Patent"); and (6) D598,254 (the "'D254 Patent" and, collectively, the "Asserted Patents").

33.    The '249 Patent was duly and legally issued by the United States Patent and Trademark Office ("USPTO") on September 27, 2011.  A true and correct copy of the '249 Patent is attached hereto as Ex. 1.

34.    The '807 Patent was duly and legally issued by the USPTO on December 13, 2016. A true and correct copy of the '807 Patent is attached hereto as Ex. 2.

35.    The '631 Patent was duly and legally issued by the USPTO on March 27, 2018.  A true and correct copy of the '631 Patent is attached hereto as Ex. 3.

36. The 'D893 Patent was duly and legally issued by the USPTO on April 10, 2018. A true and correct copy of the 'D893 Patent is attached hereto as Ex. 4.

37. The 'D255 Patent was duly and legally issued by the USPTO on August 18, 2009. A true and correct copy of the 'D255 Patent is attached hereto as Ex. 5.

38. The 'D254 Patent was duly and legally issued by the USPTO on August 18, 2009. A true and correct copy of the 'D254 Patent is attached hereto as Ex. 6.

39. Torvent is entitled to sue to collect damages for all past infringement of the Asserted Patents, as shown by the documents recorded at the USPTO at Reel 050955, Frame 0127 *et seq.* and Reel 055235, Frame 0330 *et seq.*

40. TTi is not presently a licensee of any of the Asserted Patents.

41. Neither Walmart nor Home Depot is a licensee of any of the Asserted Patents.

**Background of the Technology**

42. Line trimmers have become ubiquitous since they were invented in the 1970's. Whether gas-powered or electric, line trimmers have been of two types, "curved" shaft and "straight" shaft. A line trimmer has a rotating trimmer head that uses lengths of flexible mono-filament line as a flail for cutting vegetation. There are three basic types of trimmer heads: (1) fixed line, (2) spool semi-auto feed (*i.e.*, "Bump and Feed"), and (3) spool automatic feed cutting heads. Alliss made improvements in all three types, but it is the first two that are the subject matter of the Asserted Patents.

43. A fixed line trimmer head uses short lengths of line that are fixed in the housing of the trimmer head, which in turn is attached the trimmer's drive shaft. The line may be held in place by a clamping mechanism. Alliss made certain improvements in the clamping mechanism as embodied in his first patent, U.S. Patent No. 6,581,292. He also obtained a design patent

directed at the appearance of the fixed line trimmer head as shown in the 'D254 Design Patent, which is one of the Asserted Patents.

44.    The other Asserted Patents concern improvements to semi-auto "Bump-and-Feed" trimmer heads.  A semi-auto "Bump-and-Feed" trimmer head dispenses line by bumping a portion of the trimmer head on the ground.  The early models of semi-auto feed heads were awkward, frustrating, and difficult for the end-users to reload.  Once the filament line needed to be replenished, the early semi-auto "Bump-and-Feed" trimmer heads required disassembly of the trimmer head housing to remove a spool and then to wind line correctly onto the spool.  After replenishing the spool with line, the user would have to properly reassemble the spool into the trimmer head housing.  All of these steps were awkward in the field and wasted time.

45.    Alliss invented numerous improvements to existing semi-auto, Bump-and-Feed trimmer heads to make it easier to reload trimmer line without disassembling the trimmer heads. In addition, Alliss solved another problem.  "Curved" shaft line trimmers rotate clockwise and straight shaft trimmers rotate counterclockwise.  Prior to Alliss' inventions, the conventional wisdom was that the line needed to be wound in the direction opposite the direction of rotation. Therefore, prior to Alliss' inventions, the same trimmer head including the spool could not be used on both types without modification.  It was desirable to have a universal trimmer head that would dispense or feed trimmer line equally well regardless of the direction of rotation.  In other words, it was desirable to have a universal trimmer head that would work on either type of trimmer, curved or straight shafted.  Alliss' inventions met this need and solved other problems in the art as well.

## Background of Alliss, Torvian, and Torvent

46.    Alliss entered the field of line trimmers in 1998 when he relocated to Bladenboro, North Carolina, a small rural farm town.  Soon after arriving, in addition to other business pursuits, Alliss started a lawn mowing business with his brother.  Alliss and his brother trimmed multiple lawns during the summer of 1998.  In using line trimmers that summer, Alliss was frustrated and dissatisfied with the spool trimmer heads that came mounted on the trimmers and was equally dissatisfied with after-market alternative trimmer heads.  The problem noted by Alliss was that the trimmer line was constantly breaking-off at the eyelets and the line would retract back into the housing.  To return the trimmer to use required a user to disassemble the trimmer head, remove the spool to rewind the line onto the spool, rethread the line through the eyelets, and then reassemble the trimmer head.  This experience inspired Alliss to spend the next twenty-five years inventing improvements to trimmer heads.  Alliss has been a prolific inventor with at least twenty-two (22) U.S. Patents to his name and numerous related foreign patents.

47.  Torvian, Inc., a Delaware corporation, was created in 2000 to monetize Alliss' trimmer head inventions.  In October 2019, Torvian and Alliss' company First-To-Invent, LLC entered into an agreement to form a new entity, Torvent LLC, a Delaware entity, and to assign all patents owned by Torvian and First-To-Invent, LLC to Torvent, including the Asserted Patents.  *See* USPTO at Reel 055235, Frame 0330 *et seq*.

48.  Alliss' first invention was an improved fixed line trimmer head for which a provisional patent application was filed in 2001 and a utility application was filed on August 16, 2002, which issued as U.S. Patent 6,581,292 in June 2003.  The '292 Patent covers an improved one-way clamping mechanism for a fix line trimmer head that was easy to load and unload individual strands of trimmer line in the body of trimmer head.  When the trimmer line wears

down or breaks off, the end-user simply removes the old strands and replaces them by inserting new fixed lengths of line into the trimmer head entrance ports.  The 'D254 Patent covers the ornamental design of this improved fixed line trimmer head and is one of the Asserted Patents.

49.  In 2003, Alliss also developed an improved Easy Load, Bump-and-Feed trimmer head.  This improved design is shown in Application No. 10/652,810, which was filed on August 29, 2003, and which issued as U.S. Patent No. 6,854,185 on February 15, 2005.

50.  In 2004, Alliss' invented an Improved Easy Load, Bump-and-Feed trimmer head that had an invertible spool so that it could be used in both straight and curved shafted trimmers since it could accommodate rotation in either direction by inverting the spool. This design is shown in Provisional Application 60/569,990, which was filed on May 11, 2004.  A utility application was filed on May 11, 2005, which issued as U.S. Patent No. 7,412,768.

**Torvian's and Alliss' Ten Year Working Relationship with TTi**

51.  By 2005, Torvian had a portfolio of patents, and Alliss began to seek additional ways to monetize his inventions.  Alliss' ten-year relationship with TTi began in 2005.  Alliss approached TTi in 2005 by making a "cold call" to an assistant to the head of TTi's product development, Eric Nolin.  This ultimately led to an in-person meeting between Alliss, Todd Phinn, and Alex Phinn of Torvian and Nolin in Anderson, South Carolina.  Before any meeting was scheduled, an NDA was executed with the effective date of October 11, 2005.

52.  George Alliss continued to develop new trimmer head technology and products.  In 2006, Alliss invented an improved Easy Load, Bump-and-Feed trimmer head that utilized a curved guide channel in a spool to facilitate long drive shafts.  In addition, the spool could be inverted to accommodate either a straight or a curved drive shaft.  This new design is reflected in

Provisional Patent Application No. 60/859,246 filed November 16, 2006. A utility application was filed on November 16, 2007, which issued as the '249 Patent.

53. By 2007, Torvian had purchased injection molds and contracted with a Chinese injection mold company to manufacture a trimmer head embodying the inventions of the '249 Patent. Alliss met with Nolin, who expressed great interest in having exclusive rights to Torvian's patented improved Easy Load trimmer head (which will be referred to below as the "1st Generation Trimmer Head"). On December 18, 2007, Torvian and Homelite Technologies, Ltd. executed a Patent License Agreement (the "TTi License Agreement"). The patents licensed under the TTi License Agreement were (1) patents claiming priority to U.S. Provisional Patent Application No. 60/924,120 and (2) any patents claiming priority to U.S. Provisional Patent Application No. 60/859,246. The licensed products were (1) the "Easy Load Fixed Line Trimmer Head – Model LX17" and (2) the "Easy Load Bump and Feed Spool Trimmer Head (Bi-Directional) – Model LX50," i.e., the 1st Generation Trimmer Head. The License Agreement incorporated the Nondisclosure Agreement ("NDA") signed on October 11, 2005 (which was attached as Ex. A to the TTi License Agreement).

54. Pursuant to the TTi License Agreement, TTi began selling line trimmers with this 1st Generation Trimmer Head in Spring of 2008. However, at that time, TTi only used the 1st Generation Trimmer Head on the Toro and Ryobi-branded line trimmers sold to Home Depot. TTi did not use the 1st Generation on the Homelite-branded line trimmers. To this day, the 1st Generation Trimmer Head is being manufactured and sold by TTi and Home Depot on the Toro-branded line trimmers.

55. By late 2007, Alliss was aware that TTi was not going to use the 1st Generation Trimmer Head on the Homelite-branded line trimmers. Nolin informed Alliss that TTi would

need a trimmer head that was cheaper to produce and smaller in size compared to the 1st Generation Trimmer Head to use on the Homelite trimmers. This prompted Alliss to begin designing the 2nd Generation Trimmer Head, also referred to as the "Econo," that would be cheaper to produce than the 1st Generation Trimmer Head.

56. This improved "Econo" 2nd Generation Trimmer Head is reflected in Provisional application No. 61/071,321, filed on April 22, 2008. The 2nd Generation Trimmer Head had only an upper housing. The 2nd Generation featured a two-chamber trimmer line storage spool with a center opening in the spool for receiving TTi's extended drive shafts, which were standard on all of its vegetation trimmer models (Ryobi, Homelite, Toro). The 2nd Generation spool included a non-radial (*i.e.*, curved) trimmer line guide channel. The spool was the first truly bi-directional trimmer head in that it would work (*i.e.*, dispense trimmer line) as intended regardless of direction of rotation of the trimmer drive shaft without any physical modifications. This is in contrast to the trimmer head disclosed in the '249 Patent, which disclosed a bi-directional trimmer head that allowed the spool to be inverted for use on a shaft rotating in the opposite direction.

57. TTi favored the 2nd Generation Trimmer Head design over the 1st Generation Trimmer Head because of the lower manufacturing costs, the fact that the trimmer head was bi-directional without having to invert the spool, and that TTi could use the same quick connect bump knob fastener that it had used for many years.

58. As alluded to in the '321 Provisional Application, Alliss had begun to suspect that the direction of rotation with respect to the drive shaft did not matter for dispensing trimmer line from the spool, which was contrary to conventional wisdom in the art. The utility application 12/428,453 was filed on April 22, 2009, which issued as U.S. Patent No. 8,910,387. Before the

filing of the '453 Application, Alliss had confirmed that, contrary to convention, the direction that the line was wound around the spool did not depend on the direction the drive shaft rotated. Alliss' improved trimmer head would work equally well regardless of the direction of rotation of the trimmer's drive shaft. The '387, '807, and '631 Patents pertain to the first trimmer heads that were truly "bi-directional" wherein it could be used on either a straight or curved shaft trimmer without modification to the configuration of the spool, such as by inverting the spool.

59.   After completing the design and filing the '453 Application, Alliss offered the 2nd Generation design to Nolin. TTi introduced the 2nd Generation on the Homelite branded line trimmers in the Spring of 2010. In 2011, TTi began using the 2nd Generation Trimmer Head on the Ryobi-branded line trimmers. The 2nd Generation Trimmer Head had a curved guide channel, and, hence, was covered by the '249 Patent (which claimed priority to the '246 Application). Therefore, TTi paid the same royalty as paid for the 1st Generation Trimmer Head under the License Agreement for the 2nd Generation Trimmer Head. TTi continued to use the 1st and 2nd Generation Trimmer Heads. TTi did not introduce a different trimmer head until 2017, the design of which, as will be described below, was misappropriated by TTi.

60.   In June and July 2011, TTi and Torvian renegotiated the TTi License Agreement to change the term from life to three years from 2011 and lowering the royalties on some but not all of the licensed products. The royalty did not change for trimmer heads sold as accessories. The TTi License Agreement as amended has expired.

61.   TTi is not currently a licensee under any of the Asserted Patents or any other patents owned by Torvent.

## The Infringing TTi Third and Fourth Generation Trimmer Heads

62.    Never one to stop innovating, in 2011 – 2013, Alliss continued to make improvements to trimmer heads.

63.    One goal was to create a universal trimmer head that could work with long and short shafted trimmers.  The curved guide channel as shown in the '249 Patent accommodated TTi's long shafts.  However, others in the industry used short shafts, and TTi had expressed an interest in changing over to short shafts.

64.    A short-shafted trimmer would not require that the trimmer head use a curved guide channel.  A straight guide channel would be preferred since it is easier to insert the line through a straight guide channel.  On November 22, 2013, Alliss filed Provisional Application No. 61/907,883 that disclosed a new design for a trimmer head with a straight-through guide channel.

65.    However, it was desirable to have a universal spool that could accommodate either a long or short shaft.  After the filing of the '883 Provisional Application, Alliss conceived of a spool having a removable module, wherein a module having either a curved channel or a straight channel could be used.

66.    On November 20, 2014, Alliss filed Application No. 14/548,392, which claimed to be a continuation-in-part of the application for the '387 Patent and also claimed priority to the '883 Provisional application.  The material relating to the new design with a removable module was new as to the '392 Application with respect to the '883 Provisional and prior applications.  The '392 Application issued on December 13, 2016 as the '807 Patent.  The new, removable module design is shown, for example, in Figures 24 – 26B of the '807 Patent.

67.    The 3rd Generation Trimmer Head such as shown in Figures 24 – 26B of the '807 Patent was not designed specifically for TTi.  Instead, Torvian had plans to manufacture and

market this 3rd Generation Trimmer Head on its own as a product referred to as the "CobraMax." The CobraMax was introduced to the market in 2015 and continues to be sold.  The CobraMax was marked as follows: "U.S. Patents 8745879, 8025249, 8910387 OTHER PATENTS PENDING."  Thus, by this marking Defendants had constructive notice of these patents.  The CobraMax is an example of the 3rd Generation of improved Easy Load, Bump and Feed line trimmer heads invented by Alliss.  Other examples are found in the Accused Products as defined below.

### **TTi's Willful Misappropriation of Torvian's Inventions**

68.  Torvian was preparing to launch the CobraMax product into the market in the Spring of 2015.  The CobraMax was and is a universal trimmer head with a removable module.  The CobraMax is sold with two modules, one having a straight guide channel and the other having a curved guide channel.

69.  On March 23, 2015, at 2:50 pm, Eric Nolin sent an email to Alliss asking:

Do you have any head designs for the Reel Easy feature that do NOT have a center arbor to deal with?  We are looking for ways to improve the user-friendliness of our Reel Easy head, and one option we have been kicking around is getting rid of our center arbor.  We would be looking for a LOW COST design, very easy to load and wind… NOT quite as stout and costly as say the Echo Speed Feed…"

Ex. 22, a true and correct copy of the email dated March 23, 2015, 2:50 pm, from Nolin to Alliss (and others as shown).

70.  Alliss quickly responded at 3:31 PM as follows:

Hey Eric,

Great to hear from you !

Yes we have what you need if you decide to going that route.  We have patent coverage on straight thru guide channel top and bottom flange and guide channel that is "all most" straight through center flange for 3 flange spool.

20

. . .

Ex. 23, a true and correct copy of the email dated March 23, 2015, 3:31 pm, from Alliss to Nolin (and others).  On March 24th, Torvian sent samples of the CobraMax 3rd Generation Trimmer Head to Nolin, which he received on March 25th.

71.  As indicated, for example, by the following emails, Nolin of TTi clearly understood that Torvian expected to be compensated for its new 3rd Generation Trimmer Head design either by licensing fees or by TTi's purchasing of the new trimmer heads from Torvian.

72.  On March 24, 2015, Nolin requested that Torvian obtain a quote for the new 3rd Generation Trimmer Head assuming "850,000 pcs per year and maybe another 100,000 for accessory sales."  Ex. 24 a true and correct copy of the email dated March 24, 2015 from Nolin to Alliss (and others).

73.  On March 27, 2015, Nolin suggested that TTi pay Torvian its cost of manufacturing plus a royalty on each trimmer head.  Ex. 25, a true and correct copy of the email dated March 27, 2015 from Nolin to Alliss (and others).

74.  On March 31, 2015, Nolin proposed buying the 3rd Generation Trimmer Heads from Torvian and "let you earn your margin on the head sales."   He also proposed as an alternative "tooling it up ourselves and continuing with our royalty arrangement."  Ex. 26, a true and correct copy of the email dated March 31, 2015, from Nolin to Aliss and Alex Phinn.

75.  Alliss requested that TTi agree to an NDA prior to sending the very detailed confidential 3D CAD drawings for Torvian's CobraMax product.  An NDA was executed and made effective by its terms as of March 20, 2015.  *See* Ex. 27, a true and correct copy of the executed Non-Disclosure Agreement effective March 20, 2015.  This NDA was in addition to the NDA signed in 2005, which was Ex. A to the TTi License Agreement.

76.  Under the expectation of confidentiality as well as the expectation that TTi would compensate Torvian for its new design and the intellectual property embodied therein, Alliss instructed Torvian's engineer to send detailed 3D CAD drawings of the CobraMax to TTi, which he did by email dated April 10, 2015.  *See* Ex. 28, a true and correct copy of the email dated April 10, 2015 from Steve Hamblin to Nolin.  As noted in this email, "[a]ll of these Drawings are considered 'CONFIDENTIAL.'" *Id.*

77.  Between April 10th until the end of August, Alliss and the TTi team had almost daily communications as Alliss assisted TTi's engineering and marketing team in evaluating the new 3rd Generation design.  Alliss traveled at TTi's invitation to South Carolina to discuss TTi's evaluation of Torvian's new design on or about May 13, 2015.  During this meeting, TTi elicited confidential information from Mr. Alliss regarding his new CobraMax design, and TTi also presented a powerpoint wherein TTi's engineer demonstrated that Torvian's new design embodied in the CobraMax would work on TTi's existing trimmers with very slight modifications to several components of the trimmers beyond the trimmer head.  *See* Ex. 52, a true and correct copy of a powerpoint document dated April 27, 2015.

78.  On September 16, 2015, Alex Phinn of Torvian placed a previously scheduled phone call to Nolin to discuss moving forward to draft a new patent license agreement for the 3rd Generation Trimmer Head.  During this call, Nolin informed Phinn that it was TTi's position that it was not going to enter into a license because it was TTi's opinion that there was not any feature that was patentable.  After the call, Phinn sent an email to Nolin asking that he send Alliss the drawings for the trimmer head that Nolin had stated on the call that TTi intended to introduce by the Spring of 2016.

79. On September 17, 2015, Alliss received an email from Nolin with drawings of individual parts that were slightly modified versions of the confidential 3D CAD drawings that Torvian's engineer had sent to TTi on April 10, 2015. The modifications were slight and not materially different. *See, e.g.,* Ex. 52, (wherein TTi's engineer demonstrated that the CobraMax would work on TTi's trimmers without modification to the CobraMax trimmer head design). Nolin stated:

> If you will remember, you provided CAD files for your CobraMax head for the purpose of developing a head for TTi… . As we prototyped and evaluated the design, we found several areas that needed improvement / design changes, including smaller size, lower cost eyelets, spool changes to reduce incidents of tangling and other changes to geometry that allowed for better overall loading, all of which is reflected in this file. Again, it is our position is that there is no intellectual property in this design for which royalties would be owed. However, ***since the "foundation" of this design came from your design***, we would be willing to work out a one-time payment to compensate you for your work. We would be very interested in ***selling our version to you*** at a cost that leverages our economies of scale, as we have previously discussed.

Ex. 29 (emphasis added), a true and correct copy of the email dated September 17, 2015 from Nolin to Allis and Phinn. Thus, by this email, Nolin acknowledged that TTi copied Torvian's patented design using Torvian's confidential 3D CAD drawings provided to TTi under two NDAs. Adding insult to injury, after weeks of inducing Alliss' cooperation, Nolin audaciously offered to sell TTi's ever-so-slightly changed version to Torvian, which is exactly the opposite of Alliss' and Torvian's expectations.

80. On September 28, 2015, the Examiner for the '392 Application issued an Office Action allowing pending Claims 15 and 16, which later issued as Claims 1 and 2 in the '807 Patent.

81. On December 9, 2015, Torvian's counsel, Robert Blackmon of the law firm of Merek, Blackmon & Voorhees, LLC, sent a letter to TTi's in-house counsel, Benjamin Alley, explaining how the TTi design, which was a slightly modified version of Torvian's design,

literally infringed Claim 16 of the '387 Patent, and also infringed Claim 15 of then pending U.S. Utility Application 14/548,392 (which had published as 20150150191A1), which subsequently issued as Claim 1 in the '807 Patent. Ex. 30, a true and correct copy of the letter dated December 9, 2015 from Blackmon to Alley.

82. On February 1, 2016, outside counsel for TTi, Gayle Bush of Michael Best & Friedrich LLP in Wisconsin, responded to Blackmon's letter, and claimed that there was no infringement of the '387 Patent based on the "bidirectional" limitation as a modifier to "ratchet mechanism" limitation. Ex. 31, a true and correct copy of the letter dated February 1, 2016 from Bush to Blackmon. Bush also briefly addressed then pending Claim 15 of the '392 Application for the '807 Patent, which had yet to be issued but which the Examiner had allowed in the Office Action dated September 28, 2015. The limitation that Bush relied upon to allege noninfringement, "*bidirectional* ratchet mechanism," as to the '387 Patent was not present in the claims of the '807 Patent either as filed or as issued. Therefore, for this and other reasons, the Bush letter would not constitute a competent opinion of counsel for purposes of avoiding willful infringement as to the '807 Patent.

83. On February 11, 2016, in the '382 Application, the examiner issued an Office Action in which he allowed Claims 1, 15, 17, and 22 (which correspond to issued independent Claims 3, 1, 15, and 16, respectively), but rejected others. The rejected claims were canceled.

84. On December 12, 2016, U.S. Application No. 15/376,474 was filed. The '474 Application claimed priority as a CIP to the application for the '807 Patent as well as other previously filed applications. The '474 Application later issued as the '631 Patent.

85. The '807 Patent issued on December 16, 2016.

86.  In the Spring of 2017, Alliss discovered that Home Depot had begun selling trimmers with the 3rd Generation Trimmer Head that he had designed and Nolan and TTi had willfully misappropriated.

87.  Upon learning of the release by TTi and Home Depot of the new 3rd Generation Trimmer Head product, on March 24, 2017, Alliss sent an email to Nolin informing him that the '807 Patent had issued in December 2016 and that the new TTi products sold in Home Depot infringed the '807 Patent.  Ex. 32.  As shown, Alliss identified six Ryobi trimmer models and one replacement head all by product number that were being sold at Home Depot.  Thus, at least by this email, TTi received actual notice of the '807 Patent.

88.  TTi did not respond, so about a week later, Alliss called Nolin of TTi.  Nolin stated that TTi's position had not changed since the Bush Letter and instructed Alliss not to call again and to direct future communications to the Best law firm.

89.  On March 27, 2018, the '631 Patent issued.  There were no substantive communications between 2018 and February 2019 regarding either the '807 or '631 Patents.

90.  On February 17, 2019, Alliss sent an email to Nolin and Alley stating, in relevant part: "[p]lease see attached files of the patent(s) that relate to the TTi Reel Easy Speed Winder Trimmer Head that you are including as standard operating equipment on your Ryobi and Homelite weed trimmer machine models and as a replacement accessory item listed below." Copies of the '387, '807, 'D893, and '631 Patents, as well as others, were attached.   This email constituted actual notice to TTi of these patents in addition to previous notices given by Torvian.

91.  On October 10, 2019, TTi's representative Dyann Kostello sent a letter to Torvian informing Torvian that, pursuant to the terms of the TTi License Agreement dated 2007, the successor to the TTi entity that originally signed the License Agreement, Techtronic Outdoor

Products Technology Limited, formerly known as Homelite Technologies Ltd., was assigning its rights to its wholly-owned subsidiary, Techtronic Cordless GP, which has the same address as Eric Nolin in Anderson, S.C.  Ex. 21, a true and correct copy of the letter dated October 10, 2019 from Kostello and Chan Chi Hong to "Torvian Inc."

92.  Alliss responded to Kostello's letter (Ex. 21) by letter on November 29, 2019 wherein Alliss informed TTi that the patents had been assigned to Torvent on November 6, 2019. Ex. 33, a true and correct copy of the letter dated November 29, 2019 from Allis as the representative of Torvent to Kostello.  Furthermore, the letter stated: "Torvent, LLC welcomes the opportunity to cooperate with Techtronic Outdoor Products Technology Ltd. to negotiate a valid up-to-date Non-Exclusive Patent Licensing Agreement for patents pertaining to trimmer head product(s) that TTi was manufacturing (China) and are being sold in Territories of United States (past, present and future) (see attached Ex. 'A')." Ex. A to this letter specifically associated Torvent's patents to particular TTi products, including the Accused Products at issue in this lawsuit.  Therein, the '249, '807, '631, 'D893, 'D255, and 'D254 Patents were identified by number and associated with the Accused Products.  *Id.*  This letter again provided TTi with actual notice of these patents in addition to the notice already provided.

93.  On January 3, 2020, the in-house counsel for TTi, Ben Alley, responded to the aforementioned letter of November 29th (Ex. 33) by email stating: TTi "[did] not believe that any of the Torvent patents cover the REEL EASY – 3rd Generation and the REEL EASY – 4th Generation."  Ex. 34, true and correct copies of two emails, the first dated January 3, 2020 from Alley to Alliss, and the second dated January 5, 2020 from Alliss to Alley.

**Actual Notice to Home Depot**

94.   On or about December 29, 2019, Alliss attempted to post a product review for the Homelite 2-Cycle 26 CC Curved Shaft Gas Trimmer.  In his product review, Alliss stated that the trimmer head of this trimmer infringed at least the '807, '631, and 'D893 Patents.  *See* Ex. 35 (substantially similar posting on Amazon.com reviewing Ryobi 18 in. 10 Amp Electric Straight Shaft Sting Trimmer).  Home Depot refused to post this review as shown by the email dated December 31, 2019 from Home Depot to Alliss.  Ex. 36, a true and correct copy of the email dated December 31, 2019 from Home Depot to Alliss.  At least by this attempted post, Home Depot was provided actual notice of the '807, '631, and 'D893 Patents as well as Alliss' allegation that the trimmers infringed these patents.

**Actual Notice to Walmart**

95.   On or about April 1, 2020 Alliss submitted an on-line form on Walmart's website accusing Walmart of infringing the '631, '807, 'D893, '894, and '293 Patents.  Ex. 37, a true and correct copy of the posting by Alliss on Walmart's form on its website.  On April 2, 2020, Walmart responded, acknowledging the notice and stating: "[p]ursuant to our agreement with suppliers, we allow suppliers the opportunity to resolve patent claims directly with the claimant… ."  Walmart also identified Brenda Merriwether as the point of contact for Hart Consumer Products, Inc.  Ex. 38, a true and correct copies of two emails, the first dated April 2, 2020, from Walmart to Torvent, and the second dated April 3, 2020 from Alliss to Walmart's IPinvest@walmart.com, Kostello, Merriwether, and "dbutts" at "dbutts@tti.com.hk.  On April 3, 2020, Alliss sent a copy of his report to TTi, including Dyann Kostello, and copied Brenda Merriwether.  *Id.*

96. As stated in the email dated April 7, 2020 from Alley to Alliss, Walmart contacted TTi, and, in response, Alley requested a call with Alliss.  Ex. 39, a true and correct copy of the email dated April 7, 2020 from Alley to Alliss.  The requested call occurred on April 13, 2020. During that call, TTi stated that "TTi's position had not changed."  Ex. 40, true and correct copies of the emails dated from April 9, 2020 through April 14, 2020 between Alley and Alliss as shown.  TTi had also requested claim charts, which Alliss provided.  *Id.*

### The Accused Products

97.  TTi has made, had made, imported, used (including in testing or demonstrations), offered for sale, and/or sold the 1st Generation Trimmer Head product to Home Depot on its Toro-branded line trimmer products or as standalone replacement heads for same and continues to do so.  An example of a Toro-branded 1st Generation Trimmer Head is shown in Ex. 41.  All Toro-branded line trimmers having the 1st Generation Trimmer Head as well as accessory or replacement 1st Generation Trimmer Heads sold and for which no license fee has been paid to Torvent, and all substantially similar trimmer heads are referred to herein as "Accused 1st Generation Products."

98.  TTi had made, made, imported, used (including in testing or demonstrations), offered for sale, and/or sold   the 3rd Generation and 4th Generation trimmer heads described above, examples of which are shown in Ex. 41, which trimmer heads are sold either alone as replacement, after-market heads or assembled on completed line trimmers, and continues to do so.  TTi has sold and continues to sell these products to Home Depot and to Walmart.  Any and all products constituting or having a 3rd or 4th Generation Trimmer Head, whether a complete trimmer or as a standalone accessory product, and all substantially similar trimmer heads are referred to herein as "Accused 3rd and 4th Generation Products."

99.    On information and belief, the 3rd Generation Trimmer Head was introduced by TTi in March 2017 on various products sold to Home Depot.  On information and belief, the 4th Generation Trimmer Head was introduced in one trimmer model sold by Home Depot in December 2019.  In 2020, Home Depot sold models having either the 3rd or 4th Generation Trimmer Heads (except for the Toro-branded trimmers, which had and have the 1st Generation Trimmer Head). At least some of the available trimmer or trimmer head products sold by Home Depot in 2020 are shown in Ex. 42.  At least some of the available trimmer or trimmer head products sold by Home Depot in 2021 are shown in Ex. 43.   These and all other products having a 3rd or 4th Generation Trimmer Head are intended to be included within "Accused 3rd and 4th Generation Products."

100.    In 2020, TTi began selling line trimmers to Walmart under the brands "Hart," "Blackmax," and "Hyper Tough."  On information and belief, a Walmart affiliate (Walmart Applo, LLC) owns the trademark "HYPER TOUGH."  On information and belief, all trimmers made by TTi and sold to Walmart under the "Hart" and "Blackmax" brands utilized the 3rd Generation Trimmer Head.  At least some of Walmart's Hyper Tough line of products utilize the 3rd Generation Trimmer Heads. For example, at least the Hyper Tough 26 cc String Trimmer HY26CST (Curved Shaft) and HY26SST (Straight Shaft) utilize the 3rd Generation Trimmer Head.  In addition, Walmart sells at least one Black Max branded trimmer that utilizes the 1st Generation Trimmer Head.  *See* Ex. 53 (webpage for the Back Max 25cc Commercial-Grade Gas Trimer/Edger).  At least some of the available infringing trimmer or trimmer head products sold by Walmart in 2020 are shown in Ex. 44.  At least some of the available infringing trimmer or trimmer head products sold by Walmart in 2021 are shown in Ex. 45.  These and all other products having a 3rd or 4th Generation Trimmer Head are intended to be included within the

term "Accused 3rd and 4th Generation Products." The Accused 1st Generation and the Accused 3rd and 4th Generation Products are collectively referred to herein as the "Accused Easy Load, Bump-and-Feed Products." In addition, to the extent that TTi has made and sold or is making and selling private-labeled trimmers and/or trimmer heads to third-parties having or constituting a 1st, 3rd, or 4th Generation Trimmer Head, such trimmers and trimmer heads are included under the definition of "Accused Easy Load, Bump and Feed Products."

101.  TTi also makes and sells the Ryobi Pro Cut II Fixed Line Head, an example of which is shown in Ex. 41, to Home Depot.  This and all substantially similar products, whether found on a trimmer or a standalone accessory product, are referred to herein as "Accused Fixed Line Products."

102.  "Accused Products" refers collectively to the Accused Fixed Line Products and the Accused Easy Load, Bump-and-Feed Products.

## V.    COUNTS OF PATENT INFRINGEMENT

### COUNT I – INFRINGEMENT OF THE 'D893 PATENT

103.  Torvent incorporates paragraphs 1 through 102 as though fully set forth herein.

104.  The 'D893 Patent is a design patent.  The 'D893 Patent is generally directed to the appearance of a spool for use in a line trimmer head.

105.  Each of TTi, Home Depot, and Walmart has directly infringed the claim of the 'D893 Patent by making, importing, using, offering for sale, and/or selling some or all of the Accused 3rd and 4th Generation Products in the United States all in violation of 35 U.S.C. § 271(a).

106. More particularly, without limitation, the spool found in each of the Accused 3rd and 4th Generation Products are not materially different and both infringe the claim of the 'D893 Patent as demonstrated in the claim chart attached hereto as Ex. 46.

107. In addition or in the alternative, TTi-HK has induced TTi-US, Home Depot, and/or Walmart to directly infringe the claim of the 'D893 Patent by making, importing, using, offering for sale, and/or selling some or all of the Accused 3rd and 4th Generation Products in the United States all in violation of 35 U.S.C. § 271(b).

108. More particularly, without limitation, TTi-HK while knowing of the 'D893 Patent made or had made the Accused 3rd and 4th Generation Products in China, and sold or otherwise transferred the Accused 3rd and 4th Generation Products to TTi-US intending that such products would be imported, offered for sale, and/or sold in the United States by TTi-US, and knowing that such acts by TTi-US constituted direct infringement of the 'D893 Patent under 35 U.S.C. § 271(a).

109. The Defendants' acts of infringement have occurred within this District and elsewhere throughout the United States.

110. As a result of the Defendants' infringing conduct, Torvent has suffered damages. Each Defendant is liable to Torvent to the extent of its total profit under 35 U.S.C. § 289 together with interest and costs as fixed by this Court under 35 U.S.C. § 284.

111. Each Defendant had actual notice of the 'D893 Patent prior to the filing of this lawsuit or, alternatively, by the filing of this lawsuit.

112. Alternatively, on information and belief, TTi was willfully blind to the existence of the 'D893 Patent.

113.  Each Defendant, having actual notice of the 'D893 Patent, nevertheless continued to willfully infringe the 'D893 Patent.

114.  Torvent has suffered harm by the infringing activities of each Defendant and will be irreparably harmed unless those activities are preliminarily and permanently enjoined by this Court.  Torvent does not have an adequate remedy at law.

115.  In light of each Defendant's willful infringement, this case should be declared exceptional and attorneys' fees should be awarded under 35 U.S.C. § 285.

## COUNT II – INFRINGEMENT OF THE '807  PATENT

116.  Torvent incorporates paragraphs 1 through 115 as though fully set forth herein.

117.  The '807 Patent includes sixteen (16) claims.

118.  Each Defendant has directly infringed one or more claims of the '807 Patent by making, importing, using (including for testing or demonstrations), offering for sale, and/or selling the Accused 3rd and 4th Generation Products in the United States all in violation of 35 U.S.C. § 271(a) and/or by inducing end-users of such products in the United States to directly infringe in violation of 35 U.S.C. § 271(b).

119.  Each end-user of the Accused 3rd and 4th Generation Products directly infringes one or more claims of the '807 Patent when using these products as intended by the Defendants. More particularly, without limitation, each end-user of the Accused 3rd and 4th Generation Products directly infringes one or more claims of the '807 Patent when the end-user re-loads trimmer line into the trimmer head.  For example, and not as a limitation, each Defendant provided a user manual with the Accused 3rd and 4th Generation Products instructing the end-user how to perform one or more of the claimed methods of the '807 Patent.

120.  More particularly, without limitation, each Defendant while knowing of the '807 Patent provided made, had made, imported, offered for sale, or sold the Accused 3rd and 4th Generation Products in the United States directly or indirectly to end-users knowing and intending that the end-user would use one or more of the claimed methods to reload trimmer line, and also knowing that such act would infringe one or more claims of the '807 Patent in violation of 35 U.S.C. § 271(a).

121.  In addition or in the alternative, TTi-HK has induced TTi-US, Home Depot, and/or Walmart to directly infringed one or more claims of '807 Patent by making, importing, using, offering for sale, and/or selling some or all of the Accused 3rd and 4th Generation Products in the United States all in violation of 35 U.S.C. § 271(b).

122.  More particularly, without limitation, TTi-HK while knowing of the '807 Patent made or had made the Accused 3rd and 4th Generation Products in China, and sold or otherwise transferred the Accused 3rd and 4th Generation Products to TTi-US intending that such products would be imported, offered for sale, and/or sold in the United States by TTi-US, and knowing that such acts by TTi-US constituted direct infringement of one or more claims of the '807 Patent under 35 U.S.C. § 271(a).

123.  More particularly, without limitation as to other claims, infringement of Claim 3 is further demonstrated in Ex. 47 attached hereto.

124.  Each of the Defendants' acts of infringement have occurred within this District and elsewhere throughout the United States.

125.  As a result of each Defendants' infringing conduct, Torvent has suffered damages. Each of the Defendants is liable to Torvent in an amount that adequately compensates it for each

Defendants' infringement in an amount that is no less than a reasonable royalty, together with interest and costs as fixed by this Court under 35 U.S.C. § 284.

126.  Each of the Defendants had actual notice of the '807 Patent prior to the filing of the lawsuit, or, alternatively, by the filing of this lawsuit, yet, in spite of such notice, continued to willfully engage in infringing acts, which were egregious.

127.  Alternatively, on information and belief, TTi was willfully blind to the existence of the '807 Patent.

128.  Torvent has suffered harm by the infringing activities of each Defendant, and will be irreparably harmed unless those activities are preliminarily and permanently enjoined by this Court.  Torvent does not have an adequate remedy at law.

129.  Therefore, Torvent is entitled to enhanced damages up to treble damages under 35 U.S.C. § 284.

130.  In light of each Defendant's willful infringement, this case should be declared exceptional, and attorneys' fees should be awarded under 35 U.S.C. § 285.

### <u>COUNT III – INFRINGEMENT OF THE '631 PATENT</u>

131.  Torvent incorporates paragraphs 1 through 130 as though fully set forth herein.

132.  The '631 Patent includes twenty-four (24) claims.

133.  Each Defendant has directly infringed one or more claims of the '631 Patent by making, importing, using (including for testing or demonstrations), offering for sale, and/or selling the Accused 3rd and 4th Generation Products in the United States all in violation of 35 U.S.C. § 271(a) and/or by inducing end-users of such products to directly infringe in the United States in violation of 35 U.S.C. § 271(b).

134.  Each end-user of the Accused 3rd and 4th Generation Products directly infringes one or more claims of the '631 Patent when using these products as intended by the Defendants. More particularly, without limitation, each end-user of the Accused 3rd and 4th Generation Products directly infringes one or more claims of the '631 Patent when the end-user re-loads trimmer line into the trimmer head.  For example, and not as a limitation, each Defendant provided a user manual with the Accused 3rd and 4th Generation Products instructing the end-user how to perform one or more of the claimed methods of the '631 Patent.

135.  More particularly, without limitation, each Defendant while knowing of the '807 Patent provided made, had made, imported, offered for sale, or sold the Accused 3rd and 4th Generation Products in the United States directly or indirectly to end-users knowing and intending that the end-user would use one or more of the claimed methods to reload trimmer line, and also knowing that such act would infringe one or more claims of the '631 Patent in violation of  35 U.S.C. § 271(a).

136.  In addition or in the alternative, TTi-HK has induced TTi-US, Home Depot, and/or Walmart to directly infringed one or more claims of '631 Patent by making, importing, using, offering for sale, and/or selling some or all of the Accused 3rd and 4th Generation Products in the United States all in violation of 35 U.S.C. § 271(b).

137.  More particularly, without limitation, TTi-HK while knowing of the '631 Patent made or had made the Accused 3rd and 4th Generation Products in China, and sold or otherwise transferred the Accused 3rd and 4th Generation Products to TTi-US intending that such products would be imported, offered for sale, and/or sold in the United States by TTi-US, and knowing that such acts by TTi-US constituted direct infringement of one or more claims of the '631 Patent under 35 U.S.C. § 271(a).

138. More particularly, without limitation as to other claims, infringement of Claims 18 and 19 is further demonstrated in Ex. 48 attached hereto.

139. Each of the Defendants' acts of infringement have occurred within this District and elsewhere throughout the United States.

140. As a result of each Defendants' infringing conduct, Torvent has suffered damages. Each of the Defendants is liable to Torvent in an amount that adequately compensates it for each Defendants' infringement in an amount that is no less than a reasonable royalty, together with interest and costs as fixed by this Court under 35 U.S.C. § 284.

141. Each of the Defendants had actual notice of the '631 Patent prior to the filing of the lawsuit, or, alternatively, by the filing of this lawsuit, yet, in spite of such notice, continued to willfully engage in infringing acts, which were egregious.

142. Alternatively, on information and belief, TTi was willfully blind to the existence of the '631 Patent.

143. Therefore, Torvent is entitled to enhanced damages up to treble damages under 35 U.S.C. § 284.

144. Torvent has suffered harm by the infringing activities of each Defendant and will be irreparably harmed unless those activities are preliminarily and permanently enjoined by this Court. Torvent does not have an adequate remedy at law.

145. In light of each Defendant's willful infringement, this case should be declared exceptional, and attorneys' fees should be awarded under 35 U.S.C. § 285.

## <u>COUNT IV – INFRINGEMENT OF THE 'D255 PATENT</u>

146. Torvent incorporates paragraphs 1 through 145 as though fully set forth herein.

147.  The 'D255 Patent is a design patent having a single claim.  The 'D255 Patent is generally directed to the appearance of a trimmer head housing.

148.  Each of TTi, Home Depot, and Walmart has directly infringed the claim of the 'D255 Patent by making, importing, using, offering for sale, and/or selling some or all of the Accused 1st Generation Products (to the extent no licensing fee was paid by TTi) in the United States all in violation of 35 U.S.C. § 271(a).

149.  In addition or in the alternative, TTi-HK has induced TTi-US, Home Depot, and/or Walmart to directly infringed the claim of the 'D255 Patent by making, importing, using, offering for sale, and/or selling some or all of the Accused 1st Generation Products (to the extent no licensing fee was paid by TTi) in the United States all in violation of 35 U.S.C. § 271(b).

150.  More particularly, without limitation, TTi-HK while knowing of the 'D255 Patent made or had made the Accused 1st Generation Products (to the extent no licensing fee was paid by TTi) in China, and sold or otherwise transferred the Accused 1st Generation Products (to the extent no licensing fee was paid by TTi) to TTi-US intending that such products would be imported, offered for sale, and/or sold in the United States by TTi-US, and knowing that such acts by TTi-US constituted direct infringement of the 'D255 Patent under 35 U.S.C. § 271(a).

151.  More particularly, without limitation, infringement of the 'D255 Patent is demonstrated in the claim chart attached hereto as Ex. 49.

152.  TTi's, Home Depot's, and Walmart's acts of infringement have occurred within this District and elsewhere throughout the United States.

153.   As a result of TTI's, Home Depot's, and Walmart's infringing conduct, Torvent has suffered damages, and, therefore, each is liable to Torvent to the extent of its total profit

under 35 U.S.C. § 289, together with interest and costs as fixed by this Court under 35 U.S.C. § 284.

154.  Each of TTi, Home Depot, and Walmart had actual notice of the 'D255 Patent prior to the filing of this lawsuit or, alternatively, by the filing of this lawsuit.

155.  Alternatively, on information and belief, TTi was willfully blind to the existence of the 'D255 Patent.

156.  Each of TTi, Home Depot, and Walmart having been provided actual notice of the 'D255 Patent, nevertheless continued to willfully infringe the 'D255 Patent.

157.  Torvent has suffered harm by the infringing activities of each of the Defendants, and will be irreparably harmed unless those activities are preliminarily and permanently enjoined by this Court.  Torvent does not have an adequate remedy at law.

158.  In light of each of TTi's, Home Depot's, and Walmart's willful infringement, this case should be declared exceptional, and attorneys' fees should be awarded under 35 U.S.C. § 285.

## COUNV V – INFRINGEMENT OF THE '249 PATENT

159.  Torvent incorporates paragraphs 1 through 158 as though fully set forth herein.

160.  The '249 Patent includes twelve (12) claims, all of which are method claims.

161.  Each TTi, Home Depot, and Walmart have directly or indirectly infringed one or more claims of the '249 Patent by making, importing, using (including for testing or demonstrations), offering for sale, and/or selling the Accused 1st Generation Products (to the extent no licensing fee was paid by TTi) and /or by making, importing, using (including for testing or demonstrations), offering for sale, and/or selling the Accused 3rd and 4th Generation

Products in the United States and/or by inducing others to do so in the United States all in violation of 35 U.S.C. § 271(a) and/or (b).

162.  Each end-user of the Accused Easy Load, Bump-and-Feed Products directly infringes one or more claims of the '249 Patent by using the Accused Easy Load, Bump-and-Feed Products.  More particularly, without limitation, each end-user of the Accused Easy Load, Bump-and-Feed Products directly infringes one or more claims of the '249 Patent when the end-user re-loads trimmer line into the trimmer head. For example, and not as a limitation, each Defendant provided a user manual with the Accused Easy Load, Bump-and-Feed Products instructing the end-user how to perform one or more of the claimed methods of the '249 Patent.

163.  More particularly, without limitation, each Defendant while knowing of the '249 Patent provided made, had made, imported, offered for sale, or sold the Accused Easy Load, Bump-and-Feed Products in the United States directly or indirectly to end-users knowing and intending that the end-user would use one or more of the claimed methods to reload trimmer line, and also knowing that such act would infringe one or more claims of the '249 Patent in violation of  35 U.S.C. § 271(a).

164.  In addition or in the alternative, TTi-HK has induced TTi-US, Home Depot, and/or Walmart to directly infringed one or more claims of '249 Patent by making, importing, using, offering for sale, and/or selling the Accused Easy Load, Bump-and-Feed Products in the United States all in violation of 35 U.S.C. § 271(b).

165.  More particularly, without limitation, TTi-HK while knowing of the '249 Patent made or had made the Accused Easy Load, Bump-and-Feed Products in China, and sold or otherwise transferred the Accused Easy Load, Bump-and-Feed Products to TTi-US intending that such products would be imported, offered for sale, and/or sold in the United States by TTi-

US, and knowing that such acts by TTi-US constituted direct infringement of one or more claims of the '249 Patent under 35 U.S.C. § 271(a).

166.  More particularly, without limitation as to other claims, infringement of Claim 1 is further demonstrated in Ex. 50 attached hereto.

167.  Each of the Defendants' acts of infringement have occurred within this District and elsewhere throughout the United States.

168.  As a result of each Defendants' infringing conduct, Torvent has suffered damages. Each of the Defendants is liable to Torvent in an amount that adequately compensates it for each Defendants' infringement in an amount that is no less than a reasonable royalty, together with interest and costs as fixed by this Court under 35 U.S.C. § 284.

169.  Each of the Defendants had actual and/or constructive notice of the '249 Patent prior to the filing of this lawsuit or, alternatively, by the filing of this lawsuit, yet, in spite of such notice, continued to willfully engage in infringing acts, which were egregious.

170.  Therefore, Torvent is entitled to enhanced damages up to treble damages under 35 U.S.C. § 284.

171.  Torvent has suffered harm by the infringing activities of each Defendant, and will be irreparably harmed unless those activities are preliminarily and permanently enjoined by this Court.  Torvent does not have an adequate remedy at law.

172.  In light of each Defendant's willful infringement, this case should be declared exceptional, and attorneys' fees should be awarded under 35 U.S.C. § 285.

### COUNV VI – INFRINGEMENT OF THE 'D254 PATENT

173.  Torvent incorporates paragraphs 1 through 172 as though fully set forth herein.

174.  The 'D254 Patent is a design patent having a single claim.  The 'D254 Patent is generally directed to the appearance of a fixed line trimmer head.

175.  Each of TTi and Home Depot has directly infringed the claim of the 'D254 Patent by making, importing, using, offering for sale, and/or selling some or all of the Accused Fixed Line Products in the United States all in violation of 35 U.S.C. § 271(a).

176.  In addition or in the alternative, TTi-HK has induced TTi-US, Home Depot, and/or Walmart to directly infringed the claim of the 'D254 Patent by making, importing, using, offering for sale, and/or selling some or all of the Accused Fixed Line Products (to the extent no licensing fee was paid by TTi) in the United States all in violation of 35 U.S.C. § 271(b).

177.  More particularly, without limitation, TTi-HK while knowing of the 'D254 Patent made or had made the Accused Fixed Line Products (to the extent no licensing fee was paid by TTi) in China, and sold or otherwise transferred the Accused Fixed Line Products (to the extent no licensing fee was paid by TTi) to TTi-US intending that such products would be imported, offered for sale, and/or sold in the United States by TTi-US, and knowing that such acts by TTi-US constituted direct infringement of the 'D254 Patent under 35 U.S.C. § 271(a).

178.  More particularly, without limitation, infringement of the 'D254 Patent is demonstrated in the claim chart attached hereto as Ex. 51.

179.  TTi's acts of infringement and Home Depot's acts of infringement have occurred within this District and elsewhere throughout the United States.

180.   As a result of the Defendants' infringing conduct, Torvent has suffered damages. Each Defendant is liable to Torvent to the extent of its total profit under 35 U.S.C. § 289, together with interest and costs as fixed by this Court under 35 U.S.C. § 284.

181.  Each Defendant had actual notice of the 'D254 Patent prior to the filing of this lawsuit or, alternatively, by the filing of this lawsuit.

182.  Each Defendant, having been provided actual notice of the 'D254 Patent, nevertheless continued to willfully infringe the 'D254 Patent.

183.  Torvent has suffered harm by the infringing activities of each Defendant and will be irreparably harmed unless those activities are preliminarily and permanently enjoined by this Court.  Torvent does not have an adequate remedy at law.

184.  In light of each Defendant's willful infringement, this case should be declared exceptional, and attorneys' fees should be awarded under 35 U.S.C§ 285.

## VI.    <u>REQUEST FOR RELIEF</u>

WHEREFORE, Torvent respectfully requests that judgment be entered as follows:

A.      Declaring that each Defendant has directly infringed one or more claims of each of the Asserted Patents;

B.      Declaring that each Defendant has induced infringement of one or more claims of the Asserted Patents;

C.      Declaring that the claims of the Asserted Patents are valid and enforceable;

D.      Awarding damages to Torvent in an amount to be proven at trial, but in no event less than a reasonable royalty, under 35 U.S.C. §284;

E.      Awarding Torvent each of the Defendant's profits under 35 U.S.C. §289 for infringement of the 'D893 and/or 'D254 and/or 'D255 Design Patents;

F.      Declaring that Torvent has been irreparably harmed by the infringing activities of each of the Defendants and is likely to continue to be irreparably harmed by the Defendants' continued infringement;

G.      Preliminarily and permanently enjoining each Defendant and its officers, agents, servants, employees and those persons in active concert or participation with any of them, as well as all successors or assignees of the interests or assets related to the Accused Easy Load, Bump-and-Feed Products and/or Accused Fixed Line Products, from further infringement, direct and indirect, of the Asserted Patents;

H.      Awarding, as appropriate, expenses, costs, and disbursements incurred this action against Defendants, including prejudgment and post-judgment interest;

I.      Awarding enhanced damages up to treble damages for each of the Defendants' willful acts of infringement under 35 U.S.C. §284;

J.      Declaring this to be an exceptional case as to each Defendant that is found to have willfully infringed, and awarding attorneys' fees under 35 U.S.C. §285;

K.      Awarding such other and further relief as this Court deems just and proper.

## VII.    DEMAND FOR JURY TRIAL

Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, Torvent hereby demands a trial by jury of all issues so triable.

Dated:  June 14, 2021

Respectfully submitted,

BAYARD, P.A.

*/s/ Stephen B. Brauerman*
Stephen B. Brauerman (#4952)
Ronald P. Golden III (#6254)
600 North King Street, Suite 400
Wilmington, DE 19801
(302) 655-5000
sbrauerman@bayardlaw.com
rgolden@bayardlaw.com

Brian A. Carpenter (*ad hoc pending*)
Theodore G. Barroody (*ad hoc pending*)
James D. Tuck (*ad hoc pending*)
CARSTENS & CAHOON, LLP
13760 Noel Rd., Suite 900
Dallas, Texas 75240
(972) 367-2001
(972) 367-2002 Fax
carpenter@cclaw.com
baroody@cclaw.com
jtuck@cclaw.com

**ATTORNEYS FOR PLAINTIFF
TORVENT LLC**